IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MATTHEW J. TATUM, | ) | |
| | ) | |
| Plaintiff, | ) | 4:12CV3218 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION |
| Administration, | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY |
| Defendant. | ) | ADMINISTRATION |
| | ) | |

On October 22, 2012, Matthew J. Tatum filed a complaint against Michael J. Astrue, who was then serving as Commissioner of the Social Security Administration.[1] (ECF No. 1.) Tatum seeks a review of the Commissioner's decision to deny his applications for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 4-7.) In addition, the parties have filed briefs in support of their respective

_____

[1] On February 14, 2013, Carolyn W. Colvin was appointed to serve as Acting Commissioner of the Social Security Administration; shortly thereafter, she was automatically substituted as a party in this case pursuant to Federal Rule of Civil Procedure 25(d). (See Notice of Substitution, ECF No. 12.)

1

positions.  (See Pl.'s Br., ECF No. 10; Def.'s Br., ECF No.17.)  I have carefully reviewed these materials, and I find that the case must be remanded for further proceedings.

## I.   BACKGROUND

Tatum filed applications for disability insurance benefits and SSI benefits on or about March 28, 2007.  (Transcript of Social Security Proceedings (hereinafter "Tr.") at 187, 189.  See also id. at 347-356 (indicating that applications were filed on April 10, 2007).)  The applications were denied on initial review, (id. at 187, 189, 199-202), and on reconsideration, (id. at 190, 192, 208-212).  Tatum then requested a hearing before an ALJ.  (Id. at 213-214.)  This request was granted, and hearings were held on June 9, 2009, April 27, 2010, and June 1, 2010.  (E.g., id. at 26, 41, 92, 130.)  In a decision dated July 13, 2010, the ALJ concluded that Tatum "has not been under a disability, as defined in the Social Security Act, from March 28, 2007, through the date of this decision."  (Id. at 34 (citations omitted); see also id. at 26-40).  Tatum requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (E.g., id. at 7.)  This request was denied, (see id. at 1-5), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.   SUMMARY OF THE RECORD

On a Disability Report form, Tatum claimed that he became disabled on January 1, 2002, due to "mental illness" and stress-related depression and anxiety.  (Tr. at 402.)  Tatum later amended his alleged onset date to March 28, 2007.  (E.g., id. at 26.)  He was 32 years old on the amended alleged onset date, and he has a high school education.  (Id. at 32-33.  See also id. at 48, 408 (indicating that Tatum

attended special education classes and that he completed a six-week college course to become a nurse's aide).)  He has work experience as a clerk, a nurse assistant, a cook, a construction worker, a driver, a laborer, and a janitor.  (Id. at 49-50, 403.)

## A.    Medical Evidence[2]

On May 1, 2007, Tatum visited Patricia J. Bohart, M.D., at the Community Mental Health Center of Lancaster County (CMHC) for a follow-up medication management appointment.  (Tr. at 805.)  Tatum attempted to get his Klonopin prescription refilled early, claiming that ten of his pills fell into the toilet.  (Id.)  Dr. Bohart was "highly skeptical of this explanation," and she opined that "his old habits of wanting to pop pills when he gets anxious are difficult to break."  (Id.)  She refused to refill the medication early and emphasized that Tatum should "be in a chemical dependency program."  (Id.)

On July 6, 2007, Tatum visited Dr. Bohart for a follow-up.  (Tr. at 1063.)  Tatum's prescriptions for Abilify, Klonopin, Wellbutrin, Seroquel, Paxil, and Risperdal were renewed.  (Id.)  Tatum reported that his sleep was "not too bad . . . but he still has a lot of anxious moods and racing thoughts."  (Id.)  Dr. Bohart noted that Tatum "was at least making some efforts toward his sobriety."  (Id.)  More specifically, Tatum reported attending A.A. meetings two or three times per week and that his last substance use (marijuana) occurred in May.  (Id.)  Dr. Bohart "stressed sobriety" and directed Tatum to return in two months.  (Id.)

Tatum missed an appointment scheduled for June 11, 2007, (id. at 804), and followed up with Dr. Bohart on September 10, 2007, (id. at 1062).  He reported that

---

[2] My review of the medical evidence emphasizes the records cited by the parties in their briefs.  (See Pl.'s Br. at 3-5, ECF No. 10; Def.'s Br. at 5-9, ECF No. 17.)

he obtained a job with a moving company, but his hours were inconsistent (ranging between 50 and 10 hours per week).  (Id.)  Dr. Bohart noted that Tatum continued to maintain his sobriety "with very little supports," which left her "really pretty impressed."  (Id.)  She wrote, "If he eventually . . . gets into a program at CenterPointe or Touchstone and gets some of the help he needs I think he will do fabulously.  He says things are much better at home now that he is working and so overall I think things are really looking up for him."  (Id.)

Tatum returned for a scheduled follow-up with Dr. Bohart on November 1, 2007.  (Id. at 1061.)  He reported that he continued to maintain his sobriety, and he was working 20 to 30 hours per week at his job.  (Id.)  Dr. Bohart noted, "[Tatum's] boss there is a recovering addict, and/or alcoholic, and the boss is very understanding of [Tatum's] situation, and the boss is very easy to work for."  (Id.)  Although he was still on a waiting list at CenterPointe, he believed he would start outpatient treatment there in one week.  (Id.)  Tatum also reported that he had been able to pay his child support and was able to reacquire his driver's license.  (Id.)  Dr. Bohart wrote that Tatum "is very pleased with the fact that his life is going well, and he tells me that his self esteem has improved considerably."  (Id.)  Dr. Bohart continued Tatum's medications and directed him to follow up in six to eight weeks.  (Id.)

Tatum requested an emergency appointment with Dr. Bohart on November 8, 2007.  (Id. at 1060.)  There was concern that Tatum was suffering a crisis and "was possibly headed toward a relapse."  (Id.)  The appointment was scheduled, but Tatum canceled it and did not meet with Dr. Bohart.  (Id.)

On November 15, 2007, Tatum visited Dr. Bohart and reported that he attended a court hearing concerning his child support and was surprised to learn that he was behind in his payments.  (Id. at 1059.)  The judge told Tatum "that if he doesn't pay

4

a certain amount of money every month for the next certain number of months he is going to jail, and this completely sent [Tatum] into a tail spin." (Id.) Tatum "completely regressed and reacted in his typical way of drinking a few beers and completely panicking." (Id.) He then traveled to Oklahoma with his wife to get support from his parents, and he lost his medications. (Id.) Dr. Bohart noted that Tatum "had been doing very well up until this episode," and he is now attending CenterPointe. (Id.) She gave him samples of Seroquel and noted that he would return to his regular medication regimen in two weeks. (Id.)

Tatum failed to attend an appointment with Dr. Bohart on February 14, 2008. (Id. at 1058.) On May 20, 2008, Tatum followed up with Dr. Bohart for medication management. (Id. at 1057.) Dr. Bohart noted that Tatum had not been seen for over six months, but he "is actually doing quite well." (Id.) Tatum completed a seven-week inpatient chemical dependency program at CenterPointe, and he continues to meet with his case manager once or twice per month. (Id.) He reported that he was "no longer so 'antsy,' and overall he feels that he has made great improvements." (Id.) He also attends A.A. meetings at least four times per week, and he continued to work 60 to 70 hours per week for the moving company. (Id.) He had been sober for about seven months, and he had been working for the moving company for about the same period of time. (Id.) Dr. Bohart ordered Tatum's medications continued, directed him to obtain lab work at the People's Health Clinic, and instructed him to follow up in three months. (Id.)

On September 30, 2008, Tatum returned for another follow-up with Dr. Bohart. (Id. at 1056.) Dr. Bohart noted that she had not seen Tatum for about four months, and "things have been going quite well for him." (Id.) Tatum reported that he completed a CenterPointe program, he had "been working for a year-and-a-half for

the same moving company," he had an excellent work record there, and he had been "clean and sober . . . for between nine months and a year." (Id.)[3]  He had been taking his medications, and "[o]ther than a few minor side effects like dry mouth he basically [was] doing fine." (Id.)  Dr. Bohart wrote, "He really feels that his life has improved considerably since he has been committed to sobriety." (Id.)  Tatum's medications were continued, and he was advised to return in three months. (Id.)

Tatum returned to Dr. Bohart on December 29, 2008, and reported that "he has been having some difficulty in his life." (Id. at 1055.)  Dr. Bohart's note states, "[Tatum's] girlfriend's mother died in their apartment last week, and this was a huge stressor for [Tatum].  He is worried that he might relapse, and he is trying to maintain his sobriety." (Id.)  Dr. Bohart added Hydroxyzine to Tatum's regimen to help with his anxiety, and she advised him to return in one month. (Id.)

On January 27, 2009, Tatum visited Dr. Bohart and reported that he was doing better since his last visit. (Id. at 1054.)  Dr. Bohart noted, "He is learning how to deal with life without drugs and alcohol, and he is finding that life is a lot more enjoyable for him." (Id.)  Tatum's only "issue" was that he had not been able to lose weight, and Dr. Bohart opined that Seroquel might be causing that difficulty. (Id.)  As a result, Tatum's Seroquel dosage was lowered and his Hydroxyzine dosage was increased. (Id.)  Dr. Bohart told Tatum that he was "probably ready for individual therapy" to "deal with some of these issues that before were being covered up with drugs and alcohol," and she directed him to return for a follow-up in six to eight

---

[3] As will be discussed below, Tatum did not, in fact, work for a year-and-a-half for the same moving company.  Employment records show that he worked for two different companies for a total of approximately 5 months. (Tr. at 546-51; see also id. at 70-72, 75.)

weeks.  (Id.)

On March 2, 2009, Tatum attended an individual therapy session with Rebecca Stefanski, MS, PLMHP, at the CMHC.  (Id. at 1065.)  Ms. Stefanski indicated that Tatum's presenting problems were anxiety, sobriety, and interpersonal conflict, and that his current GAF score was 55.  (Id.)[4]

Tatum attended another therapy session with Ms. Stefanski on March 9, 2009.  (Id. at 1064.)  Tatum's presenting problems and GAF score were unchanged from the previous session.  (Id.)

Tatum followed up with Dr. Bohart on March 11, 2009, for medication management.  (Id. at 1053.)  Dr. Bohart noted that Tatum was "having a lot of anxiety," but he was "managing his symptoms pretty well."  (Id.)  Tatum was "laid off from his job due to the economy," which was disappointing, and he had not been able to find any permanent, stable employment.  (Id.)  He also learned that his girlfriend was pregnant with their second child, which was adding to his "stress load." (Id.)  However, he was "handing things appropriately and working through issues in

---

[4] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'"  Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'"  Id. at 938 n.2 (quoting DSM-IV at 32).  "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . .'"  Id. at 938 n.3 (quoting DSM-IV at 32).  A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ."  DSM-IV at 32.

therapy with Becky Stefanski." (Id.)  Tatum's medications were continued, and he was directed to remain in individual therapy with Stefanski.  (Id.)

On April 2, 2009, Tatum reported to Dr. Bohart that he smoked one marijuana cigarette on each of two separate days during the previous month.  (Id. at 1052.)  He added that "this made him feel very anxious and upset, because he felt he had to lie to his girlfriend." (Id.)  Tatum also "apparently had a seizure," possibly because he was staying up with his baby and not getting sleep.  (Id.)  Dr. Bohart removed Wellbutrin from Tatum's medication regimen and added Tegretol, which she expected would treat his seizures and possibly help with Tatum's "moods and anxiety." (Id.)

A record indicates that Tatum attended a "Stages of Change" group session at CMHC on April 29, 2009, with Nicole Larsen, MA, LMHP, PLADC, and Brenda Rohren, MA, MFS, LMHP, LADC.  (Id. at 1084.)  Ms. Larsen and Ms. Rohren noted that Tatum was "working on not smoking marijuana," and he actively participated in the group without engaging in any "unusual behaviors."  (Id.)

Also on April 29, 2009, Tatum visited Dr. Bohart for medication management. (Id. at 1079.)  He reported that the "Tegretol helped a little bit with the mood swings," but he was "still feeling somewhat frantic and anxious" and "having a few panic attacks." (Id.)  He had not had any seizures, however.  (Id.)  His medications were continued.  (Id.)

On May 6, 2009, Tatum attended another therapy session with Ms. Stefanski. (Id. at 1083.)  Ms. Stefanski noted that Tatum's presenting problems were financial issues and interpersonal conflict.  (Id.)  The record indicates that Tatum was overwhelmed by fears that his girlfriend was leaving him.  (Id.)  His GAF score remained 55.  (Id.)

On a questionnaire dated May 7, 2009, Dr. Bohart indicated that she began treating Tatum in June 2006, and that she initially diagnosed him with generalized anxiety disorder, personality disorder NOS with dependent features, and polysubstance dependence.  (Id. at 1044.)  She indicated that Tatum's current diagnoses were similar, except that his polysubstance dependence was now in remission.  (Id.)  Dr. Bohart opined that Tatum could work for short periods of time before his anxiety would "become so great he cannot sustain his work activities," adding that no employer would be willing to give Tatum the level of support he would need to sustain work.  (Id.)  On a separate form, Dr. Bohart indicated that Tatum suffered from generalized persistent anxiety accompanied by motor tension; recurrent severe panic attacks;  marked restrictions in activities of daily living; marked difficulties in maintaining social functioning, deficiencies of concentration, persistence, or pace that cause frequent failures to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work settings.  (Id. at 1046-47.)

Tatum attended another session with Ms. Stefanski on May 13, 2009.  (Id. at 1082.)  His presenting problems remained financial issues and interpersonal conflict, and his GAF score remained 55.  (Id.)  Ms. Stefanski noted that Tatum's insight and impulse control were poor, and she encouraged him to continue therapy in addition to attending A.A. meetings.  (Id.)  On the same date, Tatum attended a Stages of Change group with Ms. Larson and disclosed that he had not been taking his medications.  (Id. at 1080.)  In addition, he attended a follow-up appointment with Dr. Bohart and reported that he still had "quite a bit of anxiety," but he had suffered no seizures, was maintaining his sobriety, and was "getting along okay."  (Id. at 1078.) Dr. Bohart continued Tatum's medications and directed him to follow up with a Dr.

9

Nadala in three to four weeks.  (Id.)

On May 20, 2009, Tatum returned for another session with Ms. Stefanski.  (Id. at 1081.)  Tatum reported that he was continuing to make progress and was implementing coping skills.  (Id.)

On a questionnaire dated June 4, 2009, Ms. Stefanski indicated that she first began seeing Tatum on March 2, 2009, and that she has been treating him three times per week.  (Id. at 1076, 1098.)  She opined that "drug addiction and/or alcoholism [was] not a contributing factor material to [Tatum's] disability," and that his anxiety did not allow him to maintain substantial employment.  (Id. (emphasis omitted).)  She added that Tatum's mental health problems were "primary," and his substance abuse represented an attempt "to self medicate his mental health condition."  (Id.)  She also opined that Tatum's condition had been a life-long problem for him, and she did not believe that Tatum had been able to engage in substantial work at any time since she began treating him.  (Id. at 1077, 1099.)

On June 9, 2009, Tatum visited Gary Nadala, M.D., at the CMHC.  (Id. at 1155.)  Dr. Nadala noted that this was his first visit with Tatum, who was "a transfer from Dr. Bohart's care."  (Id.)  He also noted that Tatum was currently working at a truck stop, that his mood was "pretty stable," and that he was "doing well with his medications."  (Id.)  Dr. Nadala diagnosed anxiety disorder NOS, polysubstance dependence in partial remission, marijuana dependence, personality disorder NOS with dependent features, and moderate obesity.  (Id.)[5]  He directed Tatum to continue his medications and return for a follow-up in two months.  (Id.)

On June 24, 2009, Dr. Nadala signed a form indicating that he agreed with the

---

[5] Dr. Nadala's record includes a GAF score, but the score is illegible.  (Tr. at 1155.)

opinions stated by Ms. Stefanski in the June 4, 2009, questionnaire.  (Id. at 1097.)
On June 25, 2009, Tatum returned for a follow-up with Dr. Nadala and reported that
he was experiencing problems controlling his temper.  (Id. at 1154.)  Dr. Nadala
increased Tatum's dosage of Tegretol and directed him to return in six weeks.  (Id.)
On August 3, 2009, Tatum reported that he had been doing well, and he was better
able to control his temper.  (Id. at 1153.)

On September 28, 2009, Tatum followed up with Dr. Nadala and reported that
he was "doing okay, but he is dreading the coming season of Christmas and
Thanksgiving and seeing his family again."  (Id. at 1152.)  Dr. Nadala added Atarax
to Tatum's medication regimen and added PTSD to his list of diagnoses (which
continued to include anxiety disorder NOS, personality disorder NOS, and history of
marijuana and polysubstance dependence.  (Id.)  On November 3, 2009, Tatum
reported that he decreased his dosage of Tegretol because he was experiencing
anxiety and an upset stomach, and Dr. Nadala directed him to discontinue the
Tegretol entirely.  (Id. at 1150.)  Tatum also reported that his mood was stable, he was
experiencing less PTSD symptoms, and he was less anxious after reducing his
Tegretol.  (Id.)

Tatum attended appointments with Dr. Nadala on December 21 and 31, 2009,
and March 19, 2010, and adjustments were made to Tatum's medications based on
fluctuations in his symptoms.  (Id. at 1145, 1148, 1149, 1148.)

During March and April 2010, Tatum underwent a psychological evaluation
at CMHC after Joseph Swoboda, Ph.D., observed that Tatum might be suffering from
Attention Deficit Hyperactivity Disorder (ADHD).  (Id. at 1134.)[6]  After extensive

---

[6] This evaluation was in fact the third in a series of evaluations; the results
of the previous evaluations are documented in reports dated July 17, 2009, and

testing, Tatum was diagnosed with bipolar disorder, most recent episode depressed, severe without psychotic features, chronic, without interepisode recovery; generalized anxiety disorder; hallucinogen persisting perception disorder (flashbacks); polysubstance dependence with physiological dependence, sustained full remission; and antisocial personality disorder, among other things.  (Id. at 1140-41.)  His GAF score was 45.  (Id. at 1141.)  The "Summary and Recommendations" portion of the report states,

> Although Mr. Tatum does not qualify for an ADHD diagnosis, his performance throughout the current evaluation, as well as during recent neurocognitive assessments, indicates global neurocognitive impairment.  Based on his history, it is likely that these deficits originated during his childhood, persisted as he matured, and continue to affect him at the present time.  It is likely that these impairments are exacerbated by emotional distress.  Additionally, his fear that others will evaluate him negatively, coupled with his negative perception of his own abilities, likely affected his performance through this and previous evaluations. . . .

> Personality assessment results suggest that Mr. Tatum is experiencing pronounced psychological distress.  He sees himself in a negative light, and fears that others may do so, too.  He simultaneously yearns for and fears relationships. . . . Mr. Tatum's personality attributes and mental illness symptoms reduce his ability to cope adaptively with stressful situations.  Although he has little confidence in his ability to improve his situation, his psychological distress may provide ample motivation for him to at least attempt to adhere to treatment recommendations.  Furthermore, his personality style bodes well for his ability to sustain a strong therapeutic alliance.

> . . . He is adept at managing social interactions, as long as he is

---

January 25, 2010.  (See Tr. at 1103-06, 1110-16, 1120-27.)  I have reviewed these reports, but I shall not summarize them in this memorandum.

not incapacitated by worry that someone is evaluating him harshly. Additionally, he seems motivated to improve his situation, as evidenced by his sustained involvement and compliance with treatment. However, his emotional, neurocognitive, and personality-related difficulties likely interfere with his daily functioning.

    . . . .

Finally, due to the longstanding, complex, and severe nature of Mr. Tatum's problems, it is recommended that he undergo a comprehensive neurological evaluation to clarify the nature and, perhaps, the etiology and likely course, of his difficulties.

Although the present evaluation indicates that Mr. Tatum experiences numerous neurocognitive and psychosocial difficulties, he also exhibits a number of strengths that aide [sic] his functioning. He is personable and aware that he needs to put forth extra effort to compensate for his functional deficits. Also, his sustained voluntary participation in the present evaluation, along with other outpatient services, demonstrates his motivation to improve his life.

(Id. at 1141-42.)

In a note dated April 23, 2010, Dr. Nadala opined that Tatum was unable to maintain gainful employment. (Id. at 1132.)

## B.   Hearing Testimony

As noted previously, hearings were held before the ALJ on June 9, 2009, April 27, 2010, and June 1, 2010. (E.g., id. at 26, 41, 92, 130.) During the hearing on June 9, 2009, Tatum testified that since March 28, 2007, his anxiety, depression, and memory have become worse. (Id. at 45-46.) For approximately one month, Tatum worked full-time as a cleaner and delivery assistant at a salvage warehouse, but he lost his job because he had to keep repeating his cleaning and because he lacked a driver's license. (Id. at 46.) After reviewing his work history, Tatum testified that

his anxiety and memory lapses most significantly hinder his ability to work.  (Id. at 49-51, 58, 70.)  He added that he experiences depression and panic attacks, and he is easily distracted.  (Id. at 56-57, 60.)   As a result, when he is able to obtain employment, he is unable to maintain it for long before he suffers a breakdown.  (Id. at 60.  See also id. at 61.)  He said that medication and counseling seemed to be helping him, (id. at 52-53, 63-64), but his appointments cause attendance problems when he works, (id. at 60, 65, 66, 69).  Tatum lives with his girlfriend, who works to support the household, and Tatum watches his child when his treatment schedule and mental health permit him to do so.  (Id. at 61, 67.)  Tatum also explained that Dr. Bohart erred by noting that he worked for the same moving company for a year-and-a-half; in fact, he worked for two different moving companies during that time span. (Id. at 70-72.  See also id. at 75.)

Thomas England, Ph.D., testified at the hearing as a medical expert, and he asked Tatum a number of questions about his work, treatment, and substance abuse history.  (Id. at 41, 73-87.)  In a lengthy narrative, Dr. England offered what appears to be a tentative opinion that Tatum has "no diagnosis under category 12.03" for psychotic disorders; may have a diagnosis under category 12.04 for affective disorders; may have a 12.08 diagnosis for personality disorders; and may have a 12.09 diagnosis for substance addition disorders.  (Id. at 81-84.)  He acknowledged Ms. Stefanski's view that Tatum was unable to work due to his mental limitations irrespective of substance abuse, but appears to have discounted it on the ground that her treatment of Tatum began on March 2, 2009.  (Id. at 86.)

Michael McKeeman, A Vocational Expert (VE), also testified during the June 9, 2009, hearing.  (Id. at 87.)  The ALJ asked the VE to consider "someone such as the claimant, somewhat of the same age, education, and past work history, both as to

14

exertional, as well as skill level, and with any transferrable skills that are there, and . . . [with] no physical limitations so that he could work up to certainly a heavy RFC physically." (Id. at 88.)  The ALJ added that this person would "have a moderate limitation in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  That same limitation in the ability to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with coworkers would be at the same level.  And I think his ability to complete a normal work day and work week without interruption from psychologically based symptoms, and to perform at a consistent pace would, also, be interrupted.  So if I can sort of summarize, I don't think that any one of these certainly rises to a level to preclude work, and I guess what I see is . . . a person who is not the most reliable employee, that has, as he has described, somewhat of a personality disorder.  He has a tough time getting along with people, and with co-employees, and would, probably, miss a day a month, at least, because of a problem getting . . . himself together to get to the job on time, and so forth." (Id. at 88-89.)  When asked whether this person could perform any of Tatum's past relevant work, the VE responded, "My immediate reaction is that there would still be jobs that would exist, but the numbers would be reduced" due to the person's inability to perform semi-skilled work and his absences.  (Id. at 89.)  The ALJ then asked, "I assume that there are numerous jobs of that type in the economy, is that accurate?" (Id. at 90.)  The VE responded affirmatively.  (Id.)  Upon further questioning, the VE testified that if the hypothetical worker would miss one day per week, he would not be able to engage in competitive employment.  (Id.)

At the conclusion of the June 9, 2009, hearing, the ALJ said that records from CenterPointe and job reports from two of Tatum's past employers would be obtained,

and another hearing would be held if necessary.  (Id. at 90.)

On April 27, 2010, a second hearing was held before the ALJ.  (Id. at 130.)
The ALJ noted that the records mentioned at the conclusion of the previous hearing
had been obtained, but Tatum wished to offer additional evidence.  (Id. at 132.)
Specifically, Tatum submitted two evaluations that had been completed at CMHC,
a "narrative" from Dr. Nadala, and testimony from Dr. Swoboda.  (Id. at 132-33.)  Dr.
Swoboda testified that Tatum was given neurocognitive evaluations in July 2009 and
January 2010 after Dr. Bohart and Ms. Stefanski concluded that Tatum was having
difficulties with concentration, memory, and attention.  (Id. at 134.)  Dr. Swoboda
explained that both evaluations consisted of the same battery of tests, and the results
of the evaluations were essentially the same.  (Id. at 140.)  Specifically, the results
indicated that Tatum had "some significant neurocognitive impairments" that affected
his attention, concentration, language processing, short-term memory, spatial
manipulation, and executive functioning.  (Id. at 140-41.  See also id. at 141-44.)  Dr.
Swoboda added that these impairments were moderate to severe, and that they were
consistent with the opinions provided by Dr. Nadala, Dr. Bohard, and Ms. Stefanski.
(Id. at 141.)  He also said that it is an open question whether Tatum's alcohol use
caused the impairments, and alcohol use could certainly contribute to them–but based
on his review of the records, he believed Tatum's "main issue" was anxiety, and that
Tatum learned to "medicate with drugs and alcohol" to deal with it.  (Id. at 145.)  Dr.
Swoboda opined specifically that Tatum's condition and diagnoses would remain
irrespective of drug and alcohol abuse; indeed, Dr. Swoboda noted that since July
2009, there had been no indication that Tatum was abusing alcohol or drugs.  (Id. at
150-51.)

Dr. Swoboda also testified that he agreed with the opinions provided by Ms.

16

Stefanski, Dr. Bohart, and Dr. Nadala.  (Id. at 139.)  He did not believe that Tatum could perform substantial gainful employment due to his anxiety, depression, neurocognitive impairments, difficulties in maintaining attention, and maladaptive responses to life.  (Id. at 151.)

Tatum's fiancée also testified at the April 27, 2010, hearing.  (Id. at 169.)  She said that she and Tatum were engaged to be married and that they had two children, aged 21 months and 9 months.  (Id. at 170-71.)  She said that she did not believe that Tatum was capable of working.  (Id. at 171.)  She explained that she continually works with him on a daily basis "on completing tasks, [and] completing household chores."  (Id.)  She added that although Tatum does stay home with the children while she works, she is able to work from home when Tatum calls her for help.  (Id.)  She calls Tatum at home six to eight times per day to ensure that he and the children are OK, and she occasionally relies on friends to babysit when Tatum needs to "get himself back on track mentally" or visit CMHC.  (Id. at 171-72, 175-76.)

Tatum's fiancée also testified that he has lost countless jobs because he has problems coping when he is told what to do.  (Id. at 172-73.)  In addition, she testified that he has been free of drug and alcohol use during the past few years, and she has verified his abstinence from drugs by administering tests to him at home.  (Id. at 173-74.)

Finally, Dr. England testified at the April 27, 2010, hearing that he wanted to see treatment notes from Dr. Nadala before forming an opinion about Tatum's impairments.  (Id. at 182-83.)

As noted previously, the third hearing before the ALJ was held on June 1, 2010.  (Id. at 94.)  At this hearing, Dr. Swoboda testified that a psychological evaluation of Tatum had been completed since the date of the second hearing.  (Id.

17

at 95.) This evaluation revealed that Tatum was suffering a memory impairment, and that he was not malingering. (Id. at 96-97.) It also resulted in diagnoses of bipolar disorder without psychotic features, generalized anxiety disorder, hallucinogen persisting perception disorder with flashbacks, polysubstance dependence, and antisocial personality disorder. (Id. at 97-99.) Dr. Swoboda also explained that Tatum could not perform even simple, unskilled work due to his severe mood disorder, impaired concentration, anxiety, paranoia, memory problems, and difficulty managing stress. (Id. at 101-03.) He continued to maintain that Tatum could not be "substantially gainfully employed." (Id. at 107.)

Dr. England then provided testimony suggesting that Tatum may or may not be receiving treatment for bipolar disorder from Dr. Nadala, and on that basis seemed to hesitate accepting the conclusion that "there was a bipolar condition." (Id. at 113.) He appeared to suggest that his own "12.06" diagnosis would be "anxiety NOS," and that he preferred "personality disorder NOS" to the diagnosis of antisocial personality disorder. (Id. at 113-14.) In addition, he opined that Tatum's substance use was material to disability until approximately November 2007, but it was not "currently material." (Id. at 114-15.) He also said that he would leave his initial ratings unchanged (i.e., moderate impairment of social functioning, concentration, persistence and pace; mild impairment of activities of daily living; and no episodes of decompensation of extended duration). (Id. at 115.)

Steven Coon, a VE, also testified at the June 1, 2010, hearing. (Id. at 122.) The ALJ asked the VE to consider "someone such as the claimant, somewhat of the same age, education and past work history both as to exertional as well as skill level." (Id.) The ALJ added that this person "could lift 50 pounds on occasion, 25 pounds on a frequent basis"; "[c]ould in an eight hour day stand for six hours or sit for six

hours"; "[a]nd has unlimited use of the extremities." (Id.)  The ALJ then said,

> [H]e has some limitations that I would place at the moderate level.  And by moderate I'm defining that as being presenting a problem but being able to still satisfactorily work.  But would be so limited in the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
>
> [Assume] that his ability to accept instructions and respond appropriately to criticism from supervisors and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and I think we need to be thinking in terms of what I would call a low stress job where it is simple type repetitive type activities.
>
> And that he would probably miss a day a month because of a problem he may have in performing at a consistent pace or having an interruption from psychologically based symptoms.  And I would also think that we should try to look at a job that's not interacting with the general public.  I think that gives him concerns, from the testimony that I have heard.  And I would also place that at as a moderate level as well.  Now, with those limitations would there be any of the claimant's past relevant work that could be accomplished?

(Id. at 122-23.)  The VE responded in the negative.  (Id. at 123.)  The ALJ then asked the VE whether there would "be other work in the regional and national economy that could be done," and the VE responded affirmatively.  (Id.)  In response to a second hypothetical, the VE testified that if the hypothetical individual were absent from employment two or three times per month, he would not be capable of maintaining employment.  (Id. at 124.)  The VE also testified that Tatum's testimony, if credited, established that his impairments affected his ability to maintain work, (Id. at 124-25.)

### D.   The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The

19

ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a)  In this case, the ALJ proceeded to step five and found Tatum to be not disabled.  (See Tr. at 28-34.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b).  The ALJ found that Tatum "has not engaged in substantial gainful activity since March 28, 2007, the alleged onset date."  (Tr. at 28 (citations omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c); id. § 416.920(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. §

404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  The ALJ found that Tatum "has the following severe impairments: Anxiety, not otherwise specified; personality disorder; and affective disorder." (Tr. at 28 (citations omitted).)  The ALJ also noted that Tatum "has a history of substance use disorder," and "at the hearing, [a medical expert] opined that the condition was material to disability until late 2007." (Id.)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a); id. § 416.920(a).  The ALJ found that "[f]rom the alleged onset date until late 2007, the claimant's substance use disorder met sections 12.06 and 12.09 of the Listing Impairments at 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 29 (citations omitted).)  The ALJ added, however, that Tatum's "substance use disorder was a contributing factor material to disability," and therefore "he is considered 'not disabled' for that period." (Id.)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[7] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv),

---

[7] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  See also 20 C.F.R. § 416.945(a).

(e), (f); id. § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f).  The ALJ concluded:

> [T]he claimant, with abstinence, has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:
>
>     The claimant has "moderate" limitations (presenting a problem, but still can do satisfactory work) in the following areas: Performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and getting along with co-workers or peers without distracting them or exhibiting behavioral extremes. He requires a low-stress job with simple, repetitive activity.  He would probably miss a day a month because of problems he may have performing at a consistent pace because of interruptions from psychologically based symptoms.  These findings largely reflect the State agency's opinion concerning the claimant's mental residual functional capacity.

(Tr. at 30 (citations omitted).)  The ALJ also found that Tatum "is unable to perform any past relevant work."  (Id. at 32.)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  The ALJ wrote, "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (Tr. at 33 (citations omitted).)

22

### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).  See also Collins, 648

F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

Tatum argues that the Commissioner's decision must be reversed because "the ALJ failed to give sufficient weight and deference to the conclusions and opinions consistently and uniformly shared by [Tatum's] numerous treating physicians, including psychiatrists and a psychologist, but rather gave tremendous weight and deference to Dr. England, a non-treating physician retained as a court medical expert who has never treated nor met [Tatum]." (Pl.'s Br. at 8, ECF No. 10.) Tatum adds that the evidence provided by his treating physicians "overwhelmingly supports a finding of disability, both premised upon [Tatum] meeting Listing 12.06 and [Tatum's] clear inability to be gainfully employed." (Id. at 6. See also id. at 11-12.) In addition, Tatum maintains that the ALJ erred by concluding that his substance use disorder was a contributing factor material to disability. (Id. at 9-11.)

As noted previously, at step three of the sequential analysis "[t]he ALJ must determine whether a 'medical equivalence' exists between a claimant's impairment and a listed impairment." Myers v. Colvin, 721 F.3d 521, 524-25 (8th Cir. 2013) (quoting 20 C.F.R. §§ 404.1526(e), 416.926(e)). "To be medically equivalent, a claimant's impairment must be 'at least equal in severity and duration to the criteria of any listed impairment.'" Id. at 525 (quoting 20 C.F.R. §§ 404.1526(a), 416.926(a)). "To determine severity, an ALJ must give controlling weight to a treating source's opinion if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record.'" Id. (quoting 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2)).  See also id. ("A treating source's opinion is not 'inherently entitled' to controlling weight. . . . [W]e have upheld an ALJ's decision to discount a treating physician's opinions where those opinions were internally inconsistent, and where the physician's opinion was inconsistent with the claimant's own testimony." (citations omitted)).  "If medical equivalence is established, the claimant will be found disabled."  Id. (citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)).

Significantly, Congress has eliminated alcoholism and drug addiction as bases for obtaining social security benefits under Title II and Title XVI of the Social Security Act.  Pursuant to 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(j), an individual cannot be considered to be disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  Although it is the claimant's burden to prove that alcoholism or drug addiction is not a contributing factor, his burden is deemed satisfied if the ALJ is unable to determine whether substance use disorders are, in fact, a contributing factor.  See Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010).

Thus, "[i]n the case of alcoholism and drug addiction, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability."  Kluesner, 607 F.3d at 537 (citations omitted).  "If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of the substance abuse."  Id. (citations omitted).  If the ALJ concludes that the claimant's remaining limitations are not disabling, the claimant's substance abuse will be deemed a contributing factor material to the determination of disability.  20 C.F.R. § 404.1535(b)(2)(i), 416.935(b)(2)(i).  On the other hand, if the ALJ concludes that the claimant's remaining limitations are

disabling, the claimant's substance abuse is not a contributing factor material to the determination of disability, and the claimant will be found to be disabled independent of his substance abuse. 20 C.F.R. § 404.1535(b)(2)(i), 416.935(b)(2)(i). In reaching these conclusions, appropriate weight must be given to the opinions of the claimant's treating sources. Myers, 721 F.3d at 524-25.

In this case, the ALJ found that Tatum's impairments were medically equal to Listings 12.06 and 12.09 from the alleged onset date until "late 2007." (Tr. at 29.) Listing 12.06, which is titled "Anxiety Related Disorders," states,

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A.  Medically documented findings of at least one of the following:
>     1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>         a.  Motor tension; or
>         b.  Autonomic hyperactivity; or
>         c.  Apprehensive expectation; or
>         d.  Vigilance and scanning;
> or
>     2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>     3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
>     4.   Recurrent obsessions or compulsions which are a source of marked distress; or
>     5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
>
> AND

B.  Resulting in at least two of the following:
    1.  Marked restriction of activities of daily living; or
    2.  Marked difficulties in maintaining social functioning; or
    3.  Marked difficulties in maintaining concentration, persistence, or pace; or
    4.   Repeated episodes of decompensation, each of extended duration.

OR

C.  Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06.  In relevant part, Listing 12.09, which is titled "Substance Addiction Disorders," states, "The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied. . . .  C.  Anxiety disorders.  Evaluate under 12.06. . . ."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.09.   The ALJ explained,

> From the alleged onset date until late 2007, [Tatum] had marked restriction of activities of daily living; marked difficulties maintaining social functioning; marked difficulties maintaining concentration, persistence, and pace; and one or two episodes of decompensation of extended duration.  Accordingly, he had listing-level limitations that were disabling . . . .

(Tr. at 29.)  The ALJ also found, however, that Tatum's "substance use disorder was a contributing factor material to disability," and therefore "he is considered 'not disabled' for that period."  (Id.)  The ALJ continued,

> When [Tatum] abstains from substances, he has the following limitations: Mild restriction of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence, or pace.  When abstinent, [Tatum] has not had repeated episodes of decompensation within one year, or an average of one episode every four months, each lasting at

27

least two weeks.  He has not had episodes of decompensation that were equal in duration or functional effects to "repeated" episodes of decompensation.

Because [Tatum's] mental impairments, with abstinence, do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria. [Tatum] has not had repeated episodes of decompensation of extended duration; would not decompensate with even a minimal increase in mental demands; and has not required a highly supportive living arrangement for at least one year.

(Id.)  In short, the ALJ concluded that Tatum's "symptoms, regardless of cause, constitute[d] disability" under Listings 12.06 and 12.09 between the alleged onset date and "late 2007," but his disability would not have existed in the absence of substance abuse.  Kluesner, 607 F.3d at 537 (citations omitted).  The ALJ also evidently concluded that after "late 2007," Tatum abstained from substance abuse, and his limitations did not satisfy the requirements of any listing.

As noted above, Tatum emphasizes that each of his treating sources has opined that he cannot engage in substantial gainful employment "irrespective of" substance abuse, and he submits that their opinions are entitled to deference.  (Pl.'s Br. at 5-11, ECF No. 10.  See also Tr. at 30, 95-109, 135-53, 1044-47, 1076, 1097, 1132.)  In response, the Commissioner concedes that Dr. Swoboda, Dr. Bohart, Dr. Nadala, and Ms. Stefanski each stated that Tatum "was unable to perform substantial gainful activity due to his mental impairments including anxiety, and that these disabling limitations were present irrespective of drug or alcohol abuse."  (Def.'s Br. at 16-17, ECF No. 17.)  The Commissioner maintains, however, that the ALJ provided good

reasons for discounting their opinions.  (Id. at 17-20.)

On this point, the ALJ's decision states,

The undersigned has not given great weight to the opinions of [Tatum's] mental health care providers.  Dr. Swoboda testified at the hearing that [Tatum] could not work competitively, but he apparently saw [Tatum] only twice, testifying that he saw [Tatum] once in July 2009 for a 30-minute evaluation, and once in January 2010 for a 30-45 minute evaluation.  Records from Centerpointe and Dr. Bohart are inconsistent with employment records at Exhibits 18E and 19E, which undermines the weight the treatment records should be given.  (Exhibits 15F, 13F/10, 11F/13[.])  Ms. Stefanski is not an acceptable medical source, but her opinion could be given weight, as provided by SSR 06-3p.  However, Ms. Stefanski first saw [Tatum] on March 2, 2009, and she had seen the claimant only three months at the time of her June 4, 2009 report.  (Exhibit 12F/2[.])  On June 24, 2009, Dr. Nadala endorsed Ms. Stefanski's opinion at Exhibit 12F, but he had seen [Tatum] only once, on June 10, 2009.  (Exhibits 18F/23, 12F/2[.])

(Tr. at 32.)

After careful consideration, I find that the ALJ failed to provide good reasons for declining to give controlling weight to the opinions of Drs. Swoboda, Bohart, and Nadala, and he erred by discrediting the opinions of Ms. Stefanski.

First, the ALJ discounted Dr. Swoboda's opinions solely because "he apparently saw the [Tatum] only twice."  (Id.)  It merits mention that the ALJ's observation is likely inaccurate; although it is true that Dr. Swoboda testified during the second hearing that he saw Tatum on two occasions, (see id. at 146-47), he completed another evaluation of Tatum between the second and third hearings, and he testified about this evaluation during the third hearing, (see id. at 95, 1134-42).  In any event, there is no dispute that Dr. Swoboda is a "treating source" within the meaning of the applicable regulations, and the Commissioner has referred me to no authority suggesting that a treating source's opinion is unworthy of controlling

29

weight merely because the source saw the claimant on only two or three occasions. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (explaining that factors such as the length of the treating relationship may be considered to determine the appropriate weight to be afforded to a treating sources opinion, but such factors are considered after the Commissioner makes a preliminary determination that the treating source's opinion is unworthy of controlling weight). Cf. Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (holding that ALJ properly declined to give controlling weight to treating source's opinion given "the dearth of clinical or laboratory diagnostic data to support [his] conclusory opinion" and the "sporadic nature of the treatment relationship"). Dr. Swoboda's opinions are supported by three batteries of psychological tests and are consistent with the opinions of all of the other treating sources (and the record as a whole). The ALJ has failed to justify his decision not to afford controlling weight to Dr. Swoboda's opinions.

Second, the ALJ discounted Dr. Bohart's opinions because one of her treatment notes is "inconsistent with employment records" from AAA-1 Salvage Warehouses, Inc., and Mayflower Agency-Select Van & Storage. (Tr. at 32. See also id. at 546-51.) As noted previously, in a Psychiatric Progress Note dated September 30, 2008, Dr. Bohart wrote, "[Tatum] tells me that he has now been working for a year-and-a-half for the same moving company, and he has an excellent work record with them." (Tr. at 1056.)[8] The statement that Tatum had "been working for a year-and-a-half for the same moving company" in September 2008 conflicts with hearing testimony that Tatum never worked for a single employer for such a length of time. (Tr. at 70-72, 75.) It is also inconsistent with "Work Activity Questionnaires" completed by AAA-

---

[8] Page 1056 of the transcript is designated "Exhibit 11F/13" by the ALJ. (See Tr. at 32.)

1 Salvage Warehouses and Mayflower Agency-Select Van & Storage.  Specifically, AAA-1 Salvage Warehouses reported that Tatum worked full-time for the company and with satisfactory performance and attendance, but he was only employed between October 6, 2008, and October 24, 2008.  (Tr. at 546-47.)  Mayflower Agency-Select Van & Storage reported that Tatum worked for the company between August 15, 2007, and November 30, 2007, again with satisfactory performance and attendance, but he only worked 19 hours per week.  (Id. at 550-51.)

Essentially, the ALJ discounted all of Dr. Bohart's opinions because one sentence in one of her treatment notes is inconsistent with Tatum's employment record.  Notably, Tatum's statement to Dr. Bohart overstates his employment success; thus, it is difficult to see how the inconsistency could have caused Dr. Bohart to conclude that Tatum's limitations were greater than the record suggests.  Moreover, the Work Activity Questionnaires are consistent with Dr. Bohart's opinion that Tatum could work for "brief periods" of time, (i.e., "3 months or less"), before his anxiety would "become so great he cannot sustain his work activities."  (Tr. at 1044.)  In short, it cannot reasonably be said that Dr. Bohart's opinions are inconsistent with substantial evidence in the record, and there is no indication that her opinions are unsupported by medically acceptable clinical and laboratory techniques.  Thus, I find that the ALJ erred by failing to give controlling weight to the opinions of Dr. Bohart.

I also find that the ALJ erred by discrediting Ms. Stefanski's opinions.  Although it is true that Ms. Stefanski is not an "acceptable medical source," and although it was appropriate for the ALJ to consider the length of the treatment relationship between Ms. Stefanski and Tatum when weighing her opinions, other relevant factors indicate that Ms. Stefanski's opinions are entitled to substantial weight.  See Social Security Ruling (SSR) 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

In particular, it is significant that her opinions 1) are consistent with the opinions of each of the "acceptable medical sources," 2) were reviewed and endorsed by those sources, and 3) are consistent with the other evidence in the record. Id. Furthermore, it is not clear to me that three months of individual therapy sessions provide an insufficient foundation for Ms. Stefanski's opinions.

Finally, because there is no indication that Dr. Nadala's opinions are inconsistent with the record or unsupported by medically acceptable clinical and laboratory techniques, the ALJ erred by discounting his opinions as well.

In short, the ALJ erred by failing to give controlling weight to the opinions of Tatum's treating sources. The ALJ's conclusions that Tatum failed to meet the criteria of Listing 12.06 and that substance abuse was material to disability are not supported by substantial evidence. The Commissioner's decision must therefore be reversed.

**IT IS ORDERED** that the Commissioner of Social Security's decision is reversed.

Dated November 5, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

32